Fred C. Niederkrome et al. * v. Commissioner. Niederkrome v. Commissioner
Docket Nos. 51491, 51526-51529, 51531, 51533.
United States Tax Court
T.C. Memo 1956-255; 1956 Tax Ct. Memo LEXIS 39; 15 T.C.M. (CCH) 1312; T.C.M. (RIA) 56255; November 16, 1956
*39 1. Held, L. R. Bentson was not a bona fide participant in the transactions leading up to the acquisition by petitioners of the stock of Oregon Motor Stages and was not a bona fide stockholder in such company. Held, further, for failure of proof of error, respondent's determination that the corporate distributions by Oregon Motor Stages, in retirement of 350 shares of its stock issued in the name of L. R. Bentson and in payment of certain incidental expenses, were made at a time or under such circumstances as to be essentially equivalent to dividends taxable to petitioners, is approved. 2. Payments by Burnside Realty, Inc., during the years 1944 through 1949, under a certain lease agreement with option to purchase held not to constitute taxable income to E. Royce. 3. Held, the sum of $20,000 withdrawn by E. Royce in 1945 from Hippodrome Amusement Company was not received by him as a loan. 4. Held, Dora F. Royce was not a bona fide partner, for tax purposes, of the Yellow Cab Company of Portland during the years 1944 through 1947 and of the Yellow Cab Company of Seattle during the years 1945 through 1947. 5. Held, Eunice M. Royce, or the trust of which she was beneficiary, *40 was not, during the years involved, a bona fide partner in the Yellow Cab Company of Seattle. 6. Held, the sales in 1947 by the Yellow Cab Company of Portland of used taxicabs were understated in the amount of $4,525. Randall S. Jones, Esq., for the petitioners. John D. Picco, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion VAN FOSSAN, Judge: Respondent determined deficiencies in income tax of the petitioners for years and in amounts, as follows: Addition to Tax under
Sec.
Sec.
Year
Deficiency
294(d)(2)
293(b)
Fred C. Niederkrome, Docket No. 51491
1945
$ 32,348.48
$ 1,940.07
E. Royce and Dora F. Royce, Docket No. 51526
1948
$ 73,966.90
1949
35,145.26
Ezra Royce, Docket No. 51527
1944
$ 74,286.82
1945
495,661.69
$31,467.14
1946
143,714.83
1947
112,261.13
7,011.97
$56,130.57
B. Royce, Docket No. 51528
1945
$ 20,399.28
$ 2,005.84
1947
8,421.34
Estate of Isabelle H. Royce, Deceased,
B. Royce, Executor, Docket No. 51529
1945
$ 31,913.80
$ 2,588.89
1946
11,435.22
1947
8,421.36
Robert T. Jacob and
Agnes C. Jacob, Docket No. 51531
1945
$ 66,977.56
$ 4,035.66
Albert L. Schneider and
Bertha Schneider, Docket No. 51533
1945
$ 21,157.87
$ 1,102.38
1948
2,348.28
1949
722.40
*41 Three additional dockets initially involved in these proceedings have been settled by stipulations of the parties and decisions entered in accordance with such stipulations. The applicability of the additions to tax determined by respondent under section 294(d)(2), Internal Revenue Code of 1939, for substantial underestimate of tax is now conceded by the respective petitioners involved. Respondent abandons his determination of the so-called fraud penalty for the year 1947 in Docket No. 51527 and concedes the inapplicability thereof to the petitioner therein. Various other issues raised in the pleadings have also been settled by stipulation and adjustments resulting therefrom will be reflected in the Rule 50 recomputations consequent herein. Six issues remaining and submitted to the Court for decision are: (1) Whether the disbursements by Oregon Motor Stages in 1945 from its surplus account, in retirement of 350 shares of its stock and in payment of certain incidental expenses, under circumstances here present, constituted distributions essentially equivalent to taxable dividends, within the scope of section 115(g), Internal Revenue Code of 1939, taxable to petitioners in Docket *42 Nos. 51491, 51527, 51528, 51529, 51531 and 51533, or, in the alternative, to the petitioner in Docket No. 551527; (2) Whether certain payments made by Burnside Realty, Inc., during the years 1944 to 1949, inclusive, constituted taxable income to petitioner in Docket No. 51527; (3) Whether the disbursement of $20,000 on December 28, 1945, from the Hippodrome Amusement Company was received by petitioner in Docket No. 51527 as a dividend or as a loan; (4) Whether, during the years 1944 through 1947, the co-petitioner in Docket No. 51526, Dora F. Royce, was, for tax purposes, a bona fide member of the partnerships doing business as Yellow Cab Company of Portland and Yellow Cab Company of Seattle; (5) Whether the minor daughter of petitioners in Docket No. 51526 and petitioner in Docket No. 51527, or the trust of which she was beneficiary, was, during the years 1945 through 1949, a bona fide member for tax purposes of the partnership doing business as Yellow Cab Company of Seattle; (6) Whether the Yellow Cab Company of Portland, a partnership, understated its reported sales of used taxicabs for the year 1947, and, if so, the amount thereof. General Findings of Fact All stipulations *43 of fact filed herein by the parties are adopted and, by this reference, made a part hereof. The petitioner in Docket No. 51491 is Fred C. Niederkrome, who, during the taxable year 1945, was a resident of Portland, Oregon. The petitioners in Docket No. 51526 are Ezra Royce and his wife, Dora F. Royce, who, during the years 1944 through 1949, resided in Portland, Oregon. Ezra Royce, sometimes called Roy Royce and who will hereinafter be referred to as E. Royce, is also the petitioner in Docket No. 51527. B. Royce, who, during the years 1945 through 1947, was resident in Vancouver, Washington, is the petitioner in Docket No. 51528, and the estate of his deceased wife, Isabelle H. Royce, is the petitioner in Docket No. 51529. The petitioners in Docket No. 51531 are Robert T. and Agnes C. Jacob, husband and wife, who, during 1945, the year involved therein, were residents of Portland, Oregon. Albert L. Schneider and his wife, Bertha Schneider, are the petitioners in Docket No. 51533. During 1945, 1948 and 1949, the taxable years involved therein, Albert and Bertha resided in Clackamas County, Oregon. For the years respectively involved in the aforementioned proceedings, all *44 petitioners filed their individual or joint returns on a cash receipts and disbursements method of accounting and on a calendar year basis. In each case, such returns were filed with the then collector of internal revenue for the district of Oregon at Portland, except those returns involved in Dockets numbered 51528 and 51529, which returns were filed with the then collector of internal revenue for the district of Washington at Tacoma. Issue 1 Findings of Fact The Oregon Motor Stages (hereinafter called Stages) was organized as an Oregon corporation in 1931, and in 1945 was the largest intrastate bus company operating in Oregon. Stages operated its motor busses as a public carrier pursuant to a permanent franchise under the rules and regulations of the Interstate Commerce Commission. In June 1945, the issued and outstanding capital stock of Stages consisted of 750 shares of common stock owned as follows: 250 shares by L. D. Jones 250 shares by T. D. Wilson 250 shares by R. W. Lemon or members of his family. During April or May 1945, Schneider, after contacting the stockholders of Stages, advised E. Royce that the stock of the corporation was for sale. Promptly thereafter, *45 E. Royce and Jacob entered into discussions with various individuals and the stockholders in regard to the purchase of the stock based upon a price of $1,000 per share. As a result of the negotiations, they and B. Royce, Niederkrome and Jacob expressed a willingness to purchase a total of 400 shares. Negotiations were conducted with other individuals concerning the purchase of the remaining 350 shares of the stock. They were financially able to acquire the shares but declined to participate in the venture. Consideration of giving Stages an option to purchase the 350 shares developed at that time to the point of drafting an agreement for that purpose. During the middle or latter part of June 1945, L. R. Bentson visited Portland and was consulted about the venture. Bentson, born in 1869, was an American citizen and resided in Canada after 1906. He was an uncle of E. Royce, B. Royce and Fannie Orsen, whom he visited about once a year during a stay of 4 or 5 days in Portland. Bentson was not a man of expensive habits or a lavish spender. He and his wife lived modestly in a small house in Vancouver, B.C., which was valued at $4,200 a the time of his death in April 1950. He left an estate *46 of $33,673.06 to Fannie Orsen. He owned a house and garage in Vancouver, which he rented in 1945 for $20 and $12 per month, respectively. Bentson invested small amounts of money in Canadian securities and made regular small deposits to his bank account, which, on August 14, 1945, aggregated $6,539.42. What funds he had were said to be blocked by wartime restrictions in Canada. Prior to June 30, 1945, application for loan of $350,000 was made by E. Royce to American Business Credit Corporation, an Oregon corporation doing business in Portland, Oregon, (hereinafter sometimes called ABC-Portland). The application was duly submitted to the parent company, American Business Credit Corporation (hereinafter sometimes referred to as ABC-Delaware), a Delaware corporation, at its offices in New York City, for approval. ABC-Portland was dissolved or abandoned about 1949 and its records transferred to the main office of the parent company in New York. The application for loan of $350,000 was considered by the Executive Committee of the parent company on June 20, 1945, the pertinent portion of the minutes of which committee reads as follows: "Mr. Davidson and Mr. Ebe then submitted an application *47 on behalf of ABC-Portland. A group of outstanding individuals in Portland, headed by Messrs. Barney & Roy Royce and Robert Jacob, desire to purchase the entire capital stock of Oregon Motor Stages, largest intrastate bus company operating in Oregon. Capital stock consists in all of 750 shares Common, par value $100.00 per share, book value $537.00 per share. The stock is to be acquired for a price of $750,000. The purchasers intend to buy 400 shares for $400,000, with their own funds. They ask that we extend a line of credit of $350,000, the balance of the purchase price of the Oregon Motor Stages stock. We are asked to lend Mr. Roy Royce, personally, the sum of $350,000, on his note, to be secured by all of the capital stock of Oregon Motor Stages. Our loan to be repaid in 90 days or adjusted as conditions warrant. Mr. R. Royce's personal statement reflects a net worth of $1,366,000.00. Retiring stockholders will guarantee to R. Royce and his associates that the worth of Oregon Motor Stages is not less than the figure shown on the company's 4/30/45 statement. A fee of $5,000 plus 5% per annum on cash for every 90 days is charge contemplated. "The Committee reviewed in detail the *48 financial condition of Oregon Motor Stages as of 12/30/44 and 4/30/45 and its operating results for 1944. Mr. Davidson was questioned in respect to the proposed transaction and Mr. Dick's opinion was received. After consideration and full review, the Committee unanimously approved the credit line requested, subject to approval of counsel, and the following stipulations: "1. Subject to unanimous approval of full Portland Committee." The sale and purchase of the 750 shares of capital stock of Stages was consummated on July 2, 1945, at which time the former shareholders transferred 750 shares of stock in such manner that each of the petitioners next named and L. R. Bentson received certificates for the number of shares indicated after their respective names: Niederkrome
55
E. Royce
145
B. Royce
50
Robert T. Jacob
100
A. L. Schneider
50
L. R. Bentson
350
Total
750 All of the certificates of stock received by the persons named above were immediately endorsed in blank and turned over to a representative of ABC to secure the loan from that company of $350,000, Bentson giving his receipt to each of the others for their respective stock certificates, "such stock *49 being loaned to me to be pledged to American Business Credit Corporation as collateral to loan this day made to me for the purchase of Three Hundred Fifty (350) shares of the common capital stock of said company." On the same date, July 2, 1945, ABC issued its check for $350,000 payable to L. R. Bentson and E. Royce. The payees in turn executed a note dated July 2, 1945, in the amount of $350,000, secured by all of the capital stock of Stages, and reading as follows: "$350,000.00
Portland, Oregon,
July 2, 1945.
"On or before ninety (90) days after date, for value received, we, jointly and severally, promise to pay to the order of AMERICAN BUSINESS CREDIT CORPORATION Three Hundred Fifty Thousand and no/100 ($350,000.00) Dollars, with interest from date hereof, payable monthly on the first day of each month hereafter, at the rate of 5 per cent per annum. Principal and interest payable in lawful money of the United States of America at the office of American Business Credit Corporation, Pacific Building, Portland, Oregon; and as collateral security for the payment of this note we, jointly and severally, herewith deposit and pledge with said American Business Credit *50 Corporation 750 shares of the capital stock of Oregon Motor Stages, an Oregon corporation, evidenced by the following certificates: certificate 72 for 145 shares; certificate 73 for 100 shares; certificate 74 for 55 shares; certificate 75 for 50 shares; certificate 76 for 50 shares and certificate 77 for 350 shares; and we, jointly and severally, empower said American Business Credit Corporation, with option as to time and manner, to collect or sell and deliver all or any part of said capital stock and the certificates evidencing the same, with or without notice to us, or either of us, and to apply the proceeds thereof to the p payment of this note with all interest due thereon, and to the payment of all expenses attending the sale or protesting of the said collateral; and in case the proceeds of the sale of said collateral shall not cover the principal, interest and expenses we, jointly and severally, promise to pay the deficiency forthwith after such sale; and in case suit or action is commenced to collect this note or any portion thereof, we, jointly and severally, promise to pay such additional sum as the court may adjudge reasonable as attorney's fees in any such suit or action. *51 "/s/ L. R. Bentson /s/ E. Royce" On July 17, 1945, George W. Davidson, manager of ABC-Portland, billed Stages for $4,315.07, an amount which represented the ABC servicing fee for financing the loan, the invoice reading as follows: "Portland, Oregon, July 17, 1945 "OREGON MOTOR STAGES 506 S. W. Mill Street Portland, Oregon
"In account with Geo. W. Davidson Pacific Bldg. "To services rendered Fee $4,315.07 "Approved for Voucher July Charge to 4620 Credit to Approved for Payment "O.K. /S/ E. Royce" On July 19, 1945, Stages issued its check, No. 7-60, in the amount of $4,315.07, payable to George W. Davidson of ABC, in payment of the above invoice. The payment was charged to account No. 4620, an expense account, on the books of Stages. Two months later, on or about August 31, 1945, Stages received a letter dated August 31, 1945, signed by L. R. Bentson, reading as follows: "Vancouver, B.C. "August 31, 1945 "Oregon Motor Stages, Portland Oregon "Gentlemen: "I hereby offer to sell to Oregon Motor Stages my Three Hunderd Fifty (350) shares of stock in the Company for cash at the price of One Thousand Dollars ($1,000.00) per share, total price Three Hundred *52 Fifty Thousand Dollars ($350,000.00). You are to have thirty days in which to close the transaction, but it is understood between us that you will make every reasonable effort to do so within a lesser time. "I represent and warrant that my 350 shares of stock are free and clear of encumbrances, save and except for a note in the sum of $350,000.00 payable to the American Business Credit Corporation and the transfer will be made upon the sole condition that your Company assume and pay the amount of interest that is due and owing from me to said corporation on account of this note. "My object in desiring to dispose of this stock is that the sudden end of the war has made a great difference in my plans, and on this account I desire to be relieved of my obligation to the said American Business Credit Corporation. "Very truly yours, "/s/ L. R. Bentson August 31, 1945. "The above offer is hereby accepted. "OREGON MOTOR STAGES "By /s/ E. Royce President." In drafting the foregoing letter, the place of the addressor in the letterhead was first typed in as "Vancouver, Washington," then the word "Washington" was erased and "B.C." substituted in its place. A joint and special *53 meeting of the stockholders and directors of Stages was held on September 5, 1945, at which time such letter was considered. Bentson was one of the stockholders present at the meeting, the minutes of which meeting read in part as follows: "The President, E. Royce, presided and Secretary Robert T. Jacob kept a record of the proceedings. "Consideration was then given to the written offer of stockholder, L. R. Bentson, dated August 31, 1945, copy of which is attached to these minutes. "The president then canvassed each and every stockholder present, either in person or by proxy, and each and every share of stock present, either in person or by proxy, except the 350 shares owned by stockholder, L. R. Bentson, expressly waived the right to sell their shares to the corporation. "Thereupon consideration was given to the applicable Oregon statutes and the balance sheet of the Company as at August 31, 1945 which the President submitted to the meeting was inspected, and thereupon the following resolutions were adopted by the unanimous vote of 400 shares of stock of the Company, stockholder L. R. Bentson, at his request, being excused from voting: "WHEREAS, express power is given in *54 the Articles of Incorporation of this Company to purchase its own stock; and "WHEREAS, this Company has a surplus substantially exceeding $350,000.00, and it is to the best interests of the Company to use $350,000.00 of such surplus to retire 350 shares of its issued and outstanding capital stock at a price of $1,000.00 per share and to use $35,000.00 of such surplus for such purpose; and "WHEREAS, such purchase may be made without injury to the existing creditors and all of the stockholders of the Company, except stockholder L. R. Bentson, have waived their priority and have consented that the 350 shares belonging to L. R. Bentson shall be so purchased and retired; and "WHEREAS, said stock so purchased should be cancelled and the capital stock of the Company reduced in the amount of $35,000.00, Now, Therefore, "BE IT RESOLVED: That this Company shall purchase and retire 350 shares of stock belonging to L. R. Bentson at the price of $1,000.00 per share out of its surplus, and that the stock so purchased shall be cancelled; and "FURTHER RESOLVED: That the capital stock of this Company be reduced from $75,000.00, divided into 750 shares of the par value of $100.00 each, to *55 $40,000.00 divided into 400 shares at the par value of $100.00 each, and that the Secretary be and he is hereby instructed and directed to file with the Corporation Commissioner of Oregon an appropriate certificate and affidavit of such reduction in capital stock, as required by law. "There being no further business to come before the meeting, it was duly adjourned." On September 6, 1945, Stages purchased and retired 350 shares of capital stock, and on the same date issued its check in the amount of $350,000, payable to L. R. Bentson. The check was endorsed by Bentson and delivered to ABC-Portland in payment of the loan. The payment of $350,000 was recorded on the books of Stages as a debit to surplus of $315,000 and a debit to capital stock of $35,000. On September 17, 1945, Stages issued its check in the amount of $3,739.73 to ABC-Portland, for interest due and owing on the loan of $350,000. This payment was charged to interest expense on the books of Stages. On April 2, 1946, the corporation commissioner of the State of Oregon issued to the corporation its certificate of decrease in the capital stock of the corporation from an authorized capital stock of $75,000 to an authorized *56 capital stock of $40,000. Bentson did his own bookkeeping. In his day book Bentson listed in detail items of income and expense, and purchase and sale of securities. It contained numerous entries on stocks purchased and sold by him during the ensuing years, including the year 1945. It did not contain any entries reflecting the purchase or sale of Stages stock in 1945. Bentson was neither an officer nor a director of Stages, and he did not participate in the operation of the corporation. Schneider was general manager, vice president and director, and the only one who was actually active in the company's affairs. Jacob was secretary and director. E. Royce was president and director. Niederkrome was treasurer and director. E. Royce, Jacob and B. Royce paid for their Stages stock out of their own funds. Schneider paid for his 50 shares with his own money, although E. Royce advanced him $50,000 for the purpose for a few days. E. Royce advanced Niederkrome $55,000 for his 55 shares, and Niederkrome gave him a note for $55,000. On June 20, 1946, Niederkrome transferred his 55 shares to Schneider at the same price. Schneider paid several thousand dollars on account of the stock and gave *57 a note to E. Royce for the balance. Niederkrome's unpaid note to E. Royce was cancelled, and Schneider's note remained unpaid until the subsequent liquidation of Stages, when a compensatory offset was made against it as among the stockholders. During the respondent's investigation, Niederkrome confided to respondent's agents that he thought the corporation had obtained the loan from ABC. When the stock in the name of Bentson was offered for sale to Stages on August 31, 1945, no serious effort was made to interest other purchasers in buying the stock. The availability of the stock for sale in September of 1945 was communicated by Schneider to one of the individuals formerly interested in buying it and Schneider was informed by this individual that he was no longer interested. Stages was in good financial condition in 1945 and had a very fine earning record. It had paid substantial dividends in the years prior to 1945. Although its bus equipment was becoming somewhat worn, due to the wartime conditions, it had a large reserve available for the purchase of additional equipment; it was doing an excellent business; its gross earnings were in excess of $1,000,000 per year, and in two *58 years were in excess of $2,000,000. The petitioners were optimistic about the postwar future of Stages. It was their opinion that the company would prosper after the war, despite an expected decline in revenues as a result of the loss of military business. They thought that wages rates would be reduced, and the population of Oregon doubled, within the next 10 years. They regarded Stages as a very profitable venture, one which presented an excellent opportunity for a good, solid bus operation. Stages had an earned surplus in excess of $350,000 at the time of the stock redemption on September 6, 1945. The balance sheets of Stages as of December 31, 1944, and December 31, 1945, disclosed the following financial condition: December
December
Assets
31, 1944
31, 1945
Cash
$ 199,552.11
$236,426.54
Receivables
72,661.57
66,898.37
Inventory
13,507.03
20,699.29
Investments (Gov't
Bonds)
546,172.58
755.61
Deferred Charges
14,514.55
11,413.81
Capital Assets (Less
Reserve)
447,692.55
504,515.50
Other Assets
136,218.05
73,066.31
Total Assets
$1,430,318.44
$913,775.43
Liabilities
Payables
$ 227,559.84
$263,390.42
Accrued Expenses
655,043.98
416,750.83
Other Liabilities
1,161.84
91,164.84
Total Liabilities
$ 883,765.66
$771,306.09
Net Worth
Common Stock
$ 100,000.00
$ 40,000.00
Undivided Profits
446,552.78
102,469.34
Total Net Worth
$ 546,552.78
$142,469.34
*59 There was no diminution of or curtailment in the corporate activity and business of Stages as a result of the stock redemption. The corporation continued to operate under its permanent franchise under the Interstate Commerce Commission, and it continued to serve the people who desired to use its facilities. In 1945, Stages expended cash and incurred a long-term obligation of $90,000 for the purchase of new bus equipment costing $179,940.71, of which cost $155,945.71 was expended prior to petitioners' and Bentson's acquisition of Stages stock. In 1945, also, depreciation on Stages' equipment amounted to $119,564.23, and busses costing $74,404.12, having a depreciated basis of $3,877.87, were sold for a net profit of $18,903.83. In 1946, Stages purchased new bus equipment costing $183,009.33, and increased its long-term obligations to $155,000. Depreciation on Stages' equipment in 1946 amounted to $124,673.58, and busses costing $148,951.47, and having a depreciated basis of $700, were sold for a net profit of $44,565.81. During 1947, Stages acquired new bus equipment costing $147,862.99 and a new building costing $103,390.33; it increased its long-term obligations (equipment) to *60 $184,934.91; and it incurred a new long-term obligation (building) of $71,000. Depreciation on Stages' equipment in 1947 amounted to $138,637.85 and busses costing $56,722.11, and having a cost basis of $450, were sold for a profit of $9,990.24. The gross revenues and cumulative undivided profits of Stages for the years 1945 to 1948, inclusive, were as follows: Cumulative Undi-
vided Profits at
Year
Revenues
End of Year
1945
$2,387,331.82
$102,469.34
1946
1,802,712.13
202,356.07
1947
2,072,584.49
236,983.53
1948
1,756,559.03
218,500.09
Stages did not declare or pay dividends to its stockholders in 1945 and 1946, or in any other year under the operation of the petitioners. The taxable net income of Stages for 1945 and 1946 was $426,885.28 and $153,318.31, respectively. In answer to Question No. 8 on the income tax return of Stages for the year 1946 concerning the retention of over 70 per cent of the earnings and profits, the following reason was given: "Company is replacing equipment badly worn through the war use and is buying other equipment to better service. Needs all funds for further expansion." The record fails to overcome the *61 determination of respondent that Bentson was not a bona fide participant in the transactions leading up to the acquisition of Stages stock and was not a bona fide stockholder in Stages at all times material. The respondent's determination that the corporate distributions by Stages, in retirement of the 350 shares of its stock issued in the name of Bentson and in payment of certain incidental expenses, were made at a time or under such circumstances as to be essentially equivalent to dividends taxable to petitioners, is not overcome by the evidence of record. Opinion The issue presented involves the status of the $350,000 disbursed by Stages in retirement of the 350 shares of capital stock issued in the name of Bentson and the smaller amounts disbursed to cover the interest and incidental expenses attendant upon the note for $350,000 signed by Bentson and E. Royce and payable to ABC. That is to say, the question is whether these disbursements are to be considered essentially equivalent to dividends within the meaning of section 115(g) of the 1939 Code [1] and whether, as determined by respondent, such disbursements are taxable to the petitioners or, in the alternative, taxable *62 solely to E. Royce. In support of his determination, respondent argues that the petitioners purchased the Stages stock with the funds which they in substance borrowed from ABC, which funds were later repaid with those obtained from Stages; that the indebtedness was incurred by and for the benefit of petitioners and that its payment by the corporation constituted a dividend to them. Respondent would thus ignore the presence of Bentson in the transactions as being no more than a straw man for the petitioners collectively or, in the alternative, for E. Royce, individually. Respondent invokes the well established *63 concept that the use of corporate income for the personal benefit of the stockholders, as distinguished from benefit to the corporate enterprise, constitutes a taxable dividend to the stockholders so benefited. See H. F. Wall v. United States, 164 Fed. (2d) 462; Holloway v. Commissioner, 203 Fed. (2d) 566, affirming a Memorandum Opinion of this Court [10 TCM 1257,]; Woodworth v. Commissioner, 218 Fed. (2d) 719, affirming a Memorandum Opinion of this Court [12 TCM 1265,]. See, also, 1 Mertens, Law of Federal Taxation, sec. 9.08, and cases cited therein. On the other hand, petitioners maintain that Bentson was a bona fide participant in the transactions as they actually transpired and that the redemption of the stock issued in Bentson's name was all that it was represented to be, i.e., a valid redemption or cancellation of all of the stock of one stockholder as is contemplated by the provisions of Regs. 111, sec. 29.115-9, reading in part as follows: "The question whether a distribution in connection with a cancellation or redemption of stock is essentially equivalent to the distribution of a taxable dividend depends *64 upon the circumstances of each case. A cancellation or redemption by a corporation of a portion of its stock pro rata among all the shareholders will generally be considered as effecting a distribution essentially equivalent to a dividend distribution to the extent of the earnings and profits accumulated after February 28, 1913. On the other hand, a cancellation or redemption by a corporation of all of the stock of a particular shareholder, so that the shareholder ceases to be interested in the affairs of the corporation, does not effect a distribution of a taxable dividend. * * *" The so-called "net effect" test, announced in Flanagan v. Helvering, 116 Fed. (2d) 937, has been relied upon by certain of the courts to establish taxability as dividends. The motive for the distribution is a factor for consideration in determining whether a legitimate business purpose was the basis for the redemption. Keefe v. Cote, 213 Fed. (2d) 651; Estate of Henry A. Golwynne, 26 T.C. - (September 28, 1956). The question in the final analysis must turn on the facts. The respondent having determined that the redemption was within the terms of the applicable statute, the burden *65 of petitioners was to establish error in that conclusion. Careful consideration of all of the evidence fails to convince us that they have met that burden. Reference to some of the reasons for so concluding may be helpful. The stockholders remaining after the redemption, who, with the representative of B. Royce, are petitioners, had no desire to acquire in excess of 400 of the 750 shares of stock of Stages. A plan was considered to have Stages acquire that remaining 350 shares and a form of agreement was drafted for that purpose. At that point of the negotiations, Bentson, according to testimony of petitioners, became interested in the venture and, after considering the matter, agreed to purchase the shares. The bona fides of his participation in the venture is a basic issue. Although there is testimony that Bentson made a fortune in gold mining in Alaska, proof is lacking that in July 1945 he had a net worth ample to undertake the purchase of stock of a selling price of $350,000. Whatever the legal consequences, it is established that his funds were blocked in Canada. The small estate left by him in 1950, at the age of about 80 years, is some evidence against the contention that *66 he was a man of wealth 5 years earlier, particularly in the light of his refusal to render a net worth statement to an agent of respondent when called upon to do so during the course of his investigation. He was careful to record small transactions in books personally kept by him but he made no entry of the purchase of stock of Stages. Without some explanation for his failure to record the stock purchase, there is ground for inferring that he did not at the time regard himself as a bona fide stockholder. The contention of petitioners is based, in part, upon as assertion that Bentson applied for and was granted a loan of $350,000 by ABC to provide him with cash to make the purchase. There is testimony of petitioners to that effect, but other evidence, which we regard as much more reliable, is to the contrary. Respondent's view is that E. Royce, acting on behalf of petitioners, applied for and negotiated the loan. The minutes of the executive committee of ABC-Delaware, the parent company, stated, "We are asked to lend Mr. Roy Royce, personally, the sum of $350,000." They considered and approved a loan of that amount to "R. Royce," secured by all of the 750 shares of stock of Stages. *67 Bentson was not mentioned in the corporate record of ABC and nothing in the minutes of the meeting indicates that Bentson ever applied for the loan or had anything to do with it. Clearly, the loan was made to E. Royce. He and Bentson signed the note as co-makers. Bentson's signature on the note was not required by the executive committee in granting the loan and no proof was made of subsequent action to include him as a borrower. Thus, absent proof of any requirement by the lender that Bentson sign the note as a co-maker, he would appear to have been a mere volunteer. Moreover, the evidence convinces us that Bentson did not become involved in the transaction until after application was made for the loan by Royce. According to the testimony, Bentson became interested as a participant in the venture during a visit to Portland in June 1945 and, after an examination of Stages' financial condition and its assets located in various cities, agreed to buy the uncommitted 350 shares. But, proof is lacking that he was in Portland before application was made to ABC for the loan. Bentson stayed at the home of E. Royce during his visit. When asked at the hearing when Bentson's visit was made *68 in June 1945, E. Royce answered by testifying, "Yes, I think about in June." Jacob first testified that he met Bentson for the first time at a meeting attended by him and certain of the petitioners at the home of E. Royce during the middle or latter part of that month, and then that the meeting was held "Sometime the latter part of June. I don't recall the exact date - I remember it was a Sunday." Schneider testified that he heard several days before the meeting that Bentson was interested in acquiring stock of Stages, that he first met Bentson at the meeting, and that thereafter he accompanied Bentson on an inspection tour of all of the bus routes and facilities of Stages lasting 2 1/2 days. The precise time of the inspection trip is not shown. Without more evidence in support of petitioners on the point, we cannot find that the meeting at the home of E. Royce occurred earlier than the Sunday during the latter part of June 1945. The last Sunday in June fell on the 24th, which was 4 days after the loan application was considered by the executive committee of the parent company in New York City on the submission of the matter by Davidson, vice president of ABC-Portland. Clearly, Bentson, *69 on such facts, could not have signed the application for the loan. The respondent's determination rests, in part, on a finding that E. Royce alone applied for and negotiated the loan. Aside from the presumptive correctness of the finding, there is ample support in the evidence for that conclusion. And the circumstances are such as to create an inference that he obtained the loan for the benefit of all of the petitioners. The petitioners did not wish to invest more than $400,000 of their own money in the stock. Borrowing became either necessary or desirable to acquire the remaining 350 shares, and to obtain a loan, a pledge of all of the stock as security for the loan was required. All of the interested parties agreed to loan their stock for that purpose and it was put up as collateral for payment of the note evidencing the loan concurrently with its acquisition from the sellers. E. Royce thus assumed, as co-maker, primary liability for payment of the note and the other stockholders were liable to the extent of the value of their pledged stock. All benefited by the loan for only with it, was all of the stock acquired. Aside from these considerations of the question, we search *70 in vain for a justifiable corporate business reason for redeeming the stock. The redemption served to make available funds from surplus with which to pay the outstanding note and put petitioners in a position to repossess their stock free of any encumbrance. The retirement of about 47 per cent of the outstanding stock gave petitioners, collectively, complete ownership of Stages and increased their proportional interests in the remaining assets and future earnings without any additional investment on their part. Certainly the redemption impaired, rather than improved, the financial condition of Stages, since surplus was charged with $315,000 of the amount, the same as if a dividend of that amount had been paid. Stages paid substantial dividends prior to 1945 and none thereafter in spite of large earnings. The large surplus had been built up as a reserve for the purchase of additional equipment, and in the tax return of Stages for 1946 a statement appears that retention of earnings was required for replacement of worn equipment and further expansion. Long-term obligations, aggregating a large amount, were incurred by Stages in 1945, 1946 and 1947 to provide funds for new bus equipment *71 and other assets. The need for money for these purposes was known when the stock was redeemed. Without the redemption of stock outstanding in the name of Bentson, Stages would have had a reserve out of which the property could have been purchased. It appears from these facts that the reduction in capital stock not only operated to the financial detriment of Stages but that the stockholders were fully aware at that time that such would be the result. In any event, we find no justification for concluding under the evidence that the redemption in question served a legitimate business purpose of Stages. On this issue, respondent is sustained for lack of proof of error. As to the item of interest paid by the company in connection with the loan of $350,000, there is in the record insufficient proof to enable us to hold that respondent erred in his treatment of such item. Issue 2 Findings of Fact On April 13, 1944, L. W. Hendrickson and his wife, Sue Hendrickson, owned real and personal property located at N.W. 21st and Burnside Streets, Portland, Oregon. The property consisted of an improved 2-story building. There were 7 stores on the ground floor and 1 large ballroom known as *72 the Palais Royale Ballroom on the second floor. The property was subject to a first mortgage to Washington Mutual Savings Bank in the sum of approximately $35,300. The Hendricksons were having financial and marital troubles and in order to carry himself through his financial difficulties, Hendrickson needed $10,500. The property was placed in the hands of a realtor, I. O. Holmen, for sale. E. Royce was interested in the Palais Royale Ballroom, which he thought should be profitable on account of the war, and the great number of young men presently in Portland. He was not interested in buying the entire property at that time, and initially wanted only to lease the dance hall part. On April 13, 1944, the Hendricksons executed an option agreement pursuant to which E. Royce was given a 5-year option to purchase the property in question. This option provided, in part, as follows: "It is understood that said property is now under lease for a term which will expire April 19th, 1949, and this option is upon condition and can only be exercised after all rentals reserved in said lease have been fully paid either at the time specified in said lease or in advance thereof. Said rentals having *73 been previously fully paid, said E. Royce may exercise this option at any time prior to April 19th, 1949, and if not exercised before the day last mentioned, this instrument shall on that day become void. "It is expected that some part of the obligations outstanding against said property and mentioned in said lease will still remain unpaid at the expiration of the term of said lease. "To exercise this option, said E. Royce shall first pay or assume any remaining unpaid balance of said outstanding obligations, including principal and interest, and he shall, in addition, tender to use or either of us a sum of money the amount of which shall be determined in the following manner, to-wit: "By subtracting from the sum of $35,000.00 the aggregate of principal of said outstanding indebtedness plus interest thereon to the date of exercising said option, and the sum obtained after subtracting said amount from $35,000.00 shall be the sum to be paid to us, and nothing further shall be required of the said E. Royce to entitle him to conveyance of said property. "And we hereby consent, agree and direct that a certain deed of said real property and a bill of sale of said personal property *74 this day executed by us to said E. Royce in anticipation of his exercising said option and placed in escrow with this agreement shall, upon the exercise of said option in the manner above stated, be delivered by the escrow agent to the said E. Royce. "Providing that if the said E. Royce shall fail to exercise said option, as herein provided and within the time herein provided, or if the Lessee under said lease, or its assigns, shall for any reason surrender or abandon said lease, or discontinue all effort to carry on under said lease, then and in either of said events said deed and bill of sale so placed in escrow shall be returned to us for cancellation." On the same date, April 13, 1944, a deed and bill of sale were executed by the Hendricksons, conveying title to the premises and personal property therein to E. Royce, in anticipation of his exercising such option. These documents, together with the option agreement, were placed in escrow with the Bank of California, Portland, Oregon, with instructions to deliver the deed and bill of sale to E. Royce as soon as the option was exercised. These instructions were set forth in a letter dated May 12, 1944, and read, in part, as follows: *75 "On or about April 26, 1944, the undersigned placed with you, as an Escrow Agent for them, a Warranty Deed, Bill of Sale and Option Agreement together with a letter of instructions which letter read as follows: 'April 26, 1944 'Bank of California, National Association, Portland Branch, Portland, Oregon
'Gentlemen: 'I hand you herewith Warranty Deed, executed by Lloyd W. Hendrickson and Sue Hendickson, husband and wife, in favor of E. Royce, conveying a portion of Block 31, KINGS SECOND ADDITION to the City of Portland; also Bill of Sale between the same parties, covering equipment located and being in the building erected upon the above described property. 'Mr. and Mrs. Hendrickson have granted unto Mr. E. Royce an option to buy the above described real and personal property. This option is dated April 13, 1944, a copy being attached hereto and made a part hereof. 'You are to hold the Deed and Bill of Sale subject to the conditions set out in said option and are to deliver them according to the terms as set out therein. Lloyd W. Hendrickson will notify you when all the terms of said option have been complied with and you will then deliver to Mr. E. Royce the Deed and *76 Bill of Sale. No investigation will be required upon your part to determine whether or not the terms of said option have been complied with. 'The charges or expenses for holding said escrow are to be paid one-half by Mr. E. Royce and one-half by Lloyd W. Hendrickson and Sue Hendrickson. 'Yours truly, LLOYD W. HENDRICKSON SUE HENDRICKSON Approved By: E. ROYCE' "Now, while affirming said letter but for the purpose of simplifying and interpreting its terms and meeting certain requirements made by you, we agree as follows: "1. That it shall be the duty of said E. Royce upon exercising said option to give to you written notice thereof. "2. When you shall have such notice from said E. Royce and shall also have been advised by said Lloyd W. Hendrickson that all the terms of said option have been complied with, you shall deliver said Deed and Bill of Sale so left in Escrow to said E. Royce. "3. If said E. Royce shall fail to exercise said option, under the terms of said option agreement (copy of which was made a part of said letter and is now in your possession) then you are to deliver said Deed and Bill of Sale to said Lloyd W. Hendrickson and Sue Hendrickson under the terms *77 of said option agreement. * * *
"/s/ L. W. Hendrickson /s/ Sue Hendrickson" On April 17, 1944, E. Royce, Schneider and Harold Murphy organized Burnside Realty, Inc., an Oregon corporation (hereinafter called Burnside), with an authorized capital stock of $1,500.00, consisting of 30 shares, par value $50 per share. Each of the organizers subscribed to and paid for 10 shares, and thereby acquired a one-third interest, respectively, in the corporation. Schneider was elected president, Murphy vice president and E. Royce secretary-treasurer. Subsequently, on or about January 1, 1956, each of the original shareholders relinquished 2 1/2 per cent of their shares of stock, all of which were reissued to Edward J. Cheney, thus making 4 stockholders with each having a 25 per cent interest. Cheney maintained a dance school. Shortly after the corporation was organized, Cheney moved his dancing classes and dance school to this property. Cheney subsequently transferred title to his school of dancing to Burnside for 25 per cent of the stock of the corporation. An annual meeting of the board of directors of Burnside was held on the 14th day of January 1946. The same officers were re-elected *78 and thereafter the following motion was unanimously adopted: "Upon motion duly made, seconded and carried, unanimously, it was agreed that each of the Directors who are equal stockholders of all of the capital stock of Burnside Realty, Inc., each owning 10 shares, should surrender 2 1/2 shares of stock and that the total of said stock surrendered, 7 1/2 shares, should be reissued by the Secretary to Edward J. Cheney, and that as payment in full for said 7 1/2 shares of stock the said Edward J. Cheney was to transfer to Burnside Realty, Inc. his School of Dancing now being conducted by him in the premises known as the Palais Royale Ballroom at 2114 S. W. Burnside, Portland, Oregon." An annual meeting of the stockholders of the corporation was held on January 13, 1947, at which meeting E. Royce, Schneider and Cheney were elected directors of the corporation. At an annual meeting of the board of directors held on the same day, Schneider was elected president, Cheney vice president, and E. Royce secretary-treasurer of the corporation. Burnside was organized to engage in the business of operating rental properties and of operating a dance hall. On April 21, 1944, at a meeting of the *79 directors of Burnside Realty, Inc., a resolution was unanimously adopted authorizing the corporation to lease the premises from the Hendricksons for a term of 5 years from April 19, 1944, at a monthly rental of $1,500. On April 26, 1944, each of the stockholders loaned the corporation $3,500, or a total of $10,500, in return for which the corporation executed a promissory note for $3,500 to each of them. On or about April 29, 1944, the Hendricksons leased the property to Burnside Realty, Inc., for the agreed payments of $1,500 per month and for a 5-year term. On April 26, 1944, the corporation deposited $10,500 with the Hendricksons pursuant to the terms of the lease. This deposit represented the rent for the first month and the last 6 months of the lease. The lease to Burnside read, in part, as follows: "AGREEMENT made April 29, 1944, between LLOYD W. HENDRICKSON and SUE HENDRICKSON * * * herein called 'First Parties', and BURNSIDE REALTY, INC. * * * herein called 'Second Party', "Wherein it is mutually agreed as follows: "1. The First Parties hereby lease unto Second Party and Second Party hereby hires from First Parties all that plot of land with buildings * * * described *80 as follows: "That portion of Block 31, KING's SECOND ADDITION TO THE CITY OF PORTLAND [at Northwest 21st and Burnside Streets] * * *
together with the fixtures, furniture, furnishings and equipment now in, upon or attached to said premises * * * for the term of five years commencing April 19, 1944, and ending April 19, 1949, at the monthly rental of $1500.00 to be paid in advance on or before the first day of each and every month of said term, except as hereinafter stated. "2. The rent for the first month and the last six months of said term, being $10,500.00, has been paid at the time of the signing of this instrument, and First Parties do hereby acknowledge receipt of same. "3. The rent being now paid to the 19th day of May, 1944 and all parties desiring that monthly rentals shall fall due on the first day of each month instead of the 19th day of each month, it is agreed that on or before May 19, 1944, Second Party will pay the rent, at the rate per month above stated, for the balance of the month of May, 1944, that is to say, from May 19, 1944 to June 1, 1944, to-wit the sum of $639.34, and thereafter the monthly rentals shall be paid on or before the first day of *81 each month in advance. "4. In addition to the rental above stated, Second Party agrees to pay all taxes and fire insurance premiums for insurance on said property for the term of this lease. "5. It is understood that there is now a first mortgage on said real property held by Washington Mutual Savings Bank, which has agents at 236 S. W. Broadway in the city of Portland, county of Multnomah, state of Oregon, on which there is an unpaid balance as of this date of about $35,300.00. That said mortgage bears 5% interest and by the terms thereof is payable $550.00 per month, $200.00 of which is set aside to pay taxes and fire insurance on the property, and the balance of $350.00 is applied to pay interest and principal on the mortgage. It is understood that said mortgage is not assumed by Second Party, but payments thereon shall be made from rentals under this lease as hereinafter expressly provided, to the end that said mortgage shall not at any time become in default during the term of this lease. "6. It is also understood that First Parties had outstanding against them two other obligations; one of $7,109.39 and one of $1,487.98, now held by Carroll, Hillman & Hedlund of said city *82 of Portland, and said obligations may be liquidated by the payment of about $179.05 monthly. These obligations are not assumed by the Second Party but shall be paid out of the rentals as hereinafter provided. "7. That beginning June 1, 1944, the monthly rentals shall be [applied] as follows: "(a) The sum of $350.00 to said Washington Mutual Savings Bank, to be applied on said mortgage held by said bank. "(And to each such payment of $350.00 Second Party shall add $200.00, not a part of the rental money, as a fund to meet taxes and insurance under the terms of said mortgage, to the end that the conditions of said mortgage shall not be broken. It being herein agreed that Second Party shall pay all taxes, fire insurance, as a part of the consideration of this lease.) "(b) To Carroll, Hillman & Hedund, the sum of $179.05 to liquidate the principal and interest of said obligations held by them. "(c) To I. O. Holmen, the sum of $117.92 to pay his commission as a realtor in effecting this transaction, it being understood that the total amount due him as such commission is the sum of $6,250.00. "(d) To Lloyd W. Hendrickson and Sue Hendrickson, the balance of said monthly rental, *83 which should be about $853.03. "The rent covering the period from May 19, 1944 to June 1, 1944 shall be paid to First Parties and need not be distributed as other payments are to be distributed under this paragraph. "8. It is further agreed, anything herein to the contrary notwithstanding, that all rental payments provided for in Paragraph 7 hereof shall be made by checks payable to the respective payees, which checks shall be turned over by Second Party to First Parties and by First Parties immediately delivered to the respective payees." The lease covered the entire property, and the subtenants on the lower floor paid their rent directly to Burnside. During all of the years involved herein, Burnside operated the rental properties and the ballroom therein, and made the payments called for the lease agreement. The payments made by Burnside were allocated and paid in accordance with paragraph 7 of the lease agreement. Shortly after the option and lease agreement were negotiated, Sue Hendrickson obtained a divorce from L. W. Hendrickson. On December 4, 1945, L. W. Hendrickson sold his share of the money payments which he was entitled to receive under the lease and all his interest *84 therein to C. T. Terril. Terril in turn assigned all the rights so acquired by him to B. Royce and Isabelle Royce on December 6, 1945. On or about April 16, 1949, E. Royce exercised the option to purchase the property in accordance with the terms thereof. He paid $35,000 under the option, as follows: Payment to Sue Miller (for-
merly Sue Hendrickson)
$ 6,531.15
Liability to B. Royce
6,531.15
Balance due on Mortgage
21,937.70
Total Option Price
$35,000.00 The deed and bill of sale previously executed by the Hendricksons under date of April 13, 1944, conveying title to E. Royce, were then delivered to E. Royce by the escrow agent, and on September 23, 1949, the deed was recorded in the Record of Deeds for Multnomah County, Oregon. Schneider and Murphy have recently instituted a joint suit against E. Royce for an accounting, claiming equal ownership in the property in question. The respondent has determined that E. Royce acquired the property at N.W. 21st and Burnside Streets, Portland, Oregon, by purchase in April 1944 for a total consideration of $125,000, computed as follows: 60 monthly payments by Burnside Realty, Inc., of $1,500 each
$ 90,000
Option price of $35,000 paid on April 16, 1949, as follows: Balance due on mortgage
$21,937.70
Payment to Sue Miller (formerly Sue Hendrickson)
6,531.15
Liability to B. Royce
6,531.15
35,000
Total
$125,000
*85 The respondent further held "that the rental payments made by Burnside Realty, Inc. pursuant to the lease agreement dated April 29, 1944, on such property, reduced by allowable depreciation, constitutes taxable income to you [E. Royce]. Taxable income reported for the years 1944 to 1947, inclusive, has, therefore, been increased by [such amounts] * * *." Opinion On April 13, 1944, E. Royce obtained a 5-year option to buy the Burnside Street property for a fixed price of $35,000. On the same day, a deed and bill of sale were executed and, on April 26, 1944, placed in escrow with instructions to deliver the documents to E. Royce as soon as duly notified that the option had been exercised. Burnside was organized April 17, 1944, to engage in the business of operating rental properties and a dance hall. E. Royce was one of three original stockholders, each owning one-third interest and paying $500 therefor. Later, a fourth stockholder was added, after which each party owned 25 per cent. Each of the original stockholders, on April 26, 1944, loaned the corporation $3,500, receiving promissory notes in return. On April 29, 1944, the owners of the property (the Hendricksons) leased *86 the same to Burnside for agreed payments of $1,500 per month over a 5-year term. The corporation had deposited the sum of $10,500 with the original owners of the property, which sum was to be applied to the rent under the provisions of the lease. On April 16, 1949, E. Royce exercised his option to purchase the property by paying the agreed sum of $35,000 provided in the option and thereby liquidating certain specified obligations. Thereafter, the deed and bill of sale were duly delivered to E. Royce as the owner of the property. We are unable to follow respondent's reasoning by which he concludes that E. Royce acquired the property by purchase in April 1944 for a consideration of $125,000, consisting of $90,000 rent paid by Burnside over a 5-year period plus the $35,000 provided by the option and paid by Royce. Nor can we agree that, as respondent contends, Royce derived income from the rental payments during the 5-year term of the lease. So far as the record shows, the transactions were wholly above board and were what they seem to be - a lease to the corporation in which Royce was a minority stockholder and an option to purchase granted to E. Royce on specified conditions, all *87 of which were strictly complied with. The placing of the deed and bill of sale in escrow was a perfectly normal procedure. Title did not pass to Royce until he exercised the option and fully complied with its terms. Royce derived no taxable income from the rent payments by the corporation. Respondent is reversed. Cf. 2 Lexington Avenue Corp., 26 T.C. - (July 13, 1956), in which a somewhat comparable set of facts was involved. Issue 3 Findings of Fact The Hippodrome Amusement Company (hereinafter sometimes called Hippodrome) was an Oregon corporation engaged in the business of renting property at Seaside, Oregon. It owned two pieces of property in the center of the city, one improved, the other unimproved. Most of the improved property was devoted to rental purposes, and the balance, in 1945, was used as a dance hall. In 1945, the issued and outstanding stock of the corporation was owned as follows: E. Royce
218 shares
B. Royce
111 shares
Niederkrome
19 shares
Stephen Bartle
5 shares
Total
353 shares The first three persons above listed were directors. E. Royce was president and Niederkrome secretary and auditor of the corporation. The latter worked under *88 the former and, to a considerable extent, followed his instructions and orders. On December 28, 1945, Hippodrome issued a check payable to E. Royce in the amount of $20,000. This payment to E. Royce was recorded on the corporate books by debiting an account receivable, entitled "Due from Stockholders," and crediting the cash account. The disbursement of $20,000 to E. Royce was made with the consent and agreement of B. Royce and Niederkrome. There were no minutes of the corporation authorizing such payment. E. Royce executed no note or other evidence of indebtedness, he paid no interest at any time, and to the time of the hearing had made no repayment. E. Royce has at all times been financially able to repay the amount withdrawn by him. His personal financial statement in 1945 reflected a net worth of $1,366,000. He had large investments in many business enterprises. In 1945, E. Royce loaned Niederkrome $55,000, advanced Schneider $50,000, and invested $145,000 in stock of Stages. Later he financed the development of a gold mine called Alder Gold-Copper Company, promoted the sale of its stock, and obligated himself to supply the company with $250,000. In 1945, he reported a net income *89 of $122,951.95, which included earnings of $113,530.63 from five partnerships, namely, Yellow Cab Company of Seattle, Gray Line Motor Tours of Seattle, Yellow Cab Company of Portland, Royce Brothers of Portland, and Queen City Garage of Seattle. In 1948, Hippodrome disbursed $400 to Niederkrome which was also charged to the account receivable entitled "Due from Stockholders." Similarly, as in the case of E. Royce, there were no corporate minutes authorizing the payment; he executed no note or other evidence of indebtedness; he paid no interest at any time; and there has been no repayment. On April 1, 1954, Niederkrome opened new accounts on the books of Hippodrome entitled "Notes Receivable - E. Royce" and "Notes Receivable - F. C. Niederkrome," to which he debited $20,000 and $400, respectively, at the same time crediting the "Due from Stockholders" account with $20,400, thus closing out such account. Hippodrome operated at a loss before the war and carried a deficit for about 10 years during the 30's. In the early years it was necessary for E. Royce and B. Royce to advance moneys to the company at times to help it out. The financial and operating condition of the company improved *90 thereafter and, in the years before 1945, an earned surplus was built up, and funds were accumulated. The company continued to prosper in 1945 and the years subsequent thereto, and is presently a company in good financial standing with a book net worth of $70,000, the fair value of which is probably $140,000. Hippodrome operated on the basis of a fiscal year ending March 31. On March 31, 1945, the earned surplus was $16,576.34. It had earnings of $5,127.06 from operations during the year ended March 31, 1946. The earned surplus on March 31, 1946, was $21,703.40. There was no formal declaration of dividends by Hippodrome in December 1945. Hippodrome Amusement Company had no building program or plans for immediate expansion in 1945. Its plans for the remodeling of its buildings, or for the construction of a building on the vacant portion of its property, were not conceived or developed until 1948 or 1949. In 1948 or 1949, plans were made based on the idea of Hippodrome building a ticket office and terminal for Stages. Such plans never materialized. Stages in 1948 purchased two vacant lots adjacent to its present terminal in Seaside to provide turn-around facilities for its busses. *91 In 1954, Hippodrome entered into negotiations with the Post Office Department to erect a post office building on the unimproved portion of its property. A preliminary sketch for the building was obtained on March 17, 1954, at a cost of $60, but the negotiations were not successful. At the time of the hearing, E. Royce was negotiating with Pacific Greyhound, the largest motor operator on the West Coast, to provide it with a new location on the property, with better facilities than those which Pacific Greyhound had at Seaside. We find as an ultimate conclusion of fact that the withdrawal of $20,000 by E. Royce in 1945 was not a loan to him by Hippodrome, but was a distribution out of the profits taxable as a dividend. Opinion This issue involves only Docket No. 51527 and poses the question of whether the amount of $20,000 withdrawn from Hippodrome by E. Royce in 1945 was received by him as a dividend or as a loan. Respondent determined the former and petitioner urges the latter. The appropriate statute is section 115(a), Internal Revenue Code of 1939. [2]
*92 The question at issue turns largely on the intent of E. Royce and of Hippodrome in the premises and at the material times. That is to say, was the withdrawal intended to be left to the permanent use of Royce in lieu of a dividend or was he merely a borrower? Carl L. White, 17 T.C. 1562; Wiese v. Commissioner, 93 Fed. (2d) 921, affirming 35 B.T.A. 701. The intent of the parties is to be inferred from all the facts and inferences found on the record. The present facts, in our considered opinion, properly give rise to the controlling inference that the withdrawal, which has never been repaid, was, at all times material, intended to be and was in fact a distribution of profits and not a loan to Royce - hence our holding and findings of such a fact. Although there is not total agreement among the facts, the above conclusion is well buttressed. The greater probative weight of the evidence and the greater logic of the inferences are in opposition to petitioner's contention. On the whole record, we are convinced and have found that the payment was not a loan but was a distribution of profits taxable as a dividend. Certain it is that petitioner, who *93 has the burden of proof, has not proven the contrary. We have searched the record in vain for a valid or persuasive reason for the corporation loaning Royce, its majority stockholder and whose net worth was well in excess of $1,000,000, the relatively small sum of $20,000. Nor can we find a valid or persuasive reason, if the payment was a loan, for not repaying the same to the corporation. Respondent is sustained. Issue 4 Findings of Fact Prior to August 1, 1942, Yellow Cab Incorporated was an Oregon corporation engaged in the operation of a taxicab business in Portland, Oregon. On August 1, 1942, the corporation was liquidated and dissolved. On the same date, August 1, 1942, a partnership under the name of Yellow Cab Company (hereinafter called Portland partnership) was formed to operate the business formerly conducted by the corporation. On July 31, 1942, immediately prior to the dissolution of the corporation, E. Royce transferred 14,000 shares of the corporate stock to his wife, Dora F. Royce. This transfer represented slightly less than half of the shares of stock formerly held by him. The transfer of the stock to Dora was made in anticipation of the planned dissolution *94 of the corporation and the simultaneous formation of the partnership, and the purpose of the transfer was to qualify Dora for admission to the partnership. The Agreement and Articles of Partnership of Portland Yellow Cab provided, in part, as follows: "The following Articles of Partnership entered into on this 1st day of August, 1942, by and between E. ROYCE, B. ROYCE, CHARLES W. KEFFER, C. H. LUTON, DORA F. ROYCE and ISABELLE H. ROYCE, of Portland, Oregon, and Vancouver, Washington. "WITNESSETH: "THAT, WHEREAS, the parties hereto owned all of the common stock of Yellow Cab Incorporated, a corporation; and "WHEREAS, upon the liquidation of said company on the 1st day of August, 1942, said company sold, assigned and transferred to the parties hereto all its assets; and "WHEREAS, the parties hereto have assumed all of the liabilities of the corporation; "NOW, THEREFORE, IT IS MUTUALLY AGREED by and between the parties hereto that they will accept said assets and assume all of the liabilities of said corporation, and that the following agreements shall constitute their "ARTICLES OF PARTNERSHIP "I. "Said parties above named agree to carry on business under the name *95 and style of "YELLOW CAB COMPANY "II. "The partnership to which this agreement applies began on this the 1st day of August, 1942, and shall continue for the duration of the joint lives of the parties hereto, unless otherwise dissolved by action of the parties. * * *
"IV. "The principal office and place of business of the partnership shall be in the City of Portland, Multnomah County, Oregon, and at such other place or places as the partners shall hereafter determine. "V. "The capital of said partnership shall consist of the assets formerly owned by Yellow Cab Incorporated, a corporation, together with all the income and profits arising from the employment of said assets in the business conducted hereunder and not paid to the partners in drawings or by disbursement of profits, and the interests of the respective partners hereto shall be as follows: "E. Royce
26.1575%
B. Royce
26.1575%
Charles W. Keffer
.659%
C. H. Luton
.906%
Dora F. Royce
23.06%
Isabelle H. Royce
23.06%
* * *
"VII. "The profits and losses of the partnership business shall be borne by the parties in the proportion to the interest designated in paragraph V. above. *96 "VIII. "Each of the parties shall have an equal voice in the control of the business and operation of the partnership. It shall be the duty of the partnership to keep accurate books of account, which shall be open at all reasonable times to the inspection and examination of each of the partners. "IX. "Upon the dissolution of the partnership at or prior to the death of any of the partners, the said business shall be wound up, debts of the partners to the partnership, if any, paid, and the surplus divided between the partners according to their respective interests as herein set forth. "IN WITNESS WHEREOF, the parties hereto have cause their signatures to be affixed to these Articles of Partnership on the day and date first above written. "/s/ E. Royce, /s/ B. Royce, /s/ C. H. Luton, /s/ Charles W. Keffer, /s/ Dora F. Royce, /s/ Isabelle H. Royce." Lutton and Keffer, referred to above, were employees, and their small partnership interests were purchased by E. Royce and B. Royce on November 28, 1942. Prior to April 20, 1944, Yellow Cab Company of Seattle was a Washington corporation engaged in the operation of a taxicab business in Seattle, Washington. The issued and *97 outstanding shares of stock of the corporation were owned as follows: W. L. Rothschild
607 1/2
J. A. Baldi
606
Geo. E. Worster
606
D. N. Newton
606
E. Royce
1,402 1/2
B. Royce
1,402 1/2
A. H. Wenck
269
Total Shares
5,500 On May 1, 1944, the Yellow Cab Company was liquidated and dissolved. On the same date, May 1, 1944, a partnership of the same name (hereinafter called Seattle partnership) was formed to operate the business formerly conducted by the corporation. On April 20, 1944, immediately prior to the dissolution of the Seattle corporation, E. Royce transferred 402 1/2 shares of the corporate stock to his wife, Dora F. Royce. At the same time he transferred 700 shares of the stock to himself as trustee for his minor daughter, Eunice Royce, then 14 or 15 years of age. He retained 300 shares of stock for himself. On the same date, April 20, 1944, E. Royce executed a declaration of trust by which he declared himself trustee of the 700 shares of stock in trust for Eunice Royce. The transfers of the stock to Dora F. Royce, and to himself as trustee for Eunice Royce, were made in anticipation of the planned dissolution of the corporation and the simultaneous *98 formation of the partnership, and the purpose of the transfers of stock was to qualify Dora and the trust for admission to the partnership. Gift tax returns were filed covering the gifts of stock in the Seattle corporation to both Dora and the trust. The Articles of Copartnership of the Seattle partnership provided, in part, as follows: "THIS AGREEMENT, made as of May 1, 1944, by and between B. ROYCE, First Party, E. ROYCE, Second Party, E. ROYCE, Trustee for E. M. ROYCE, a minor, Third Party, D. F. ROYCE, Fourth Party, A. H. WENCK, Fifth Party, W. L. ROTHSCHILD, Sixth Party, J. A. BALDI, Seventh Party, G. E. WORSTER, Eighth Party, D. N. NEWTON, Ninth Party, and L. S. ACKERMAN, Tenth Party, WITNESSETH: "FORMATION OF PARTNERSHIP. FIRST: The parties hereto hereby associate themselves as partners and hereby form and constitute themselves a partnership under the laws of the State of Washington, for the purpose of conducting a business of transportation of persons for hire by means of taxicabs, in the City of Seattle, State of Washington, or any other transportation business whether of persons or property which may be determined upon by decision of two-thirds in interest of the partners. *99 "TERM. SECOND: The term of the partnership shall commence on May 1, 1944 and shall terminate on May 1, 1949; Provided, however, that this agreement shall be automatically extended for further and additional successive periods of five (5) years each, unless any party give written notice to the other parties of his or her intention to terminate this agreement at the expiration of any five-year period, such notice to be given not less than sixty (60) days prior to the first day of May of the year in which such notice is given. "LOCATION OF BUSINESS. THIRD: The location of the principal place of business of the partnership shall be in the City of Seattle, King County, State of Washington. "NAME. FOURTH: The said partnership shall be conducted under the firm name and style of YELLOW CAB COMPANY. No partner shall have any right to the use of the name apart from this partnership or any successor partnership which may be formed of which such partner may be a member. "CAPITAL. FIFTH: The partnership shall commence business with a capital consisting of all assets of whatsoever kind and nature of Yellow Cab Company of Seattle, a Washington corporation, as the same were on April 30, 1944, subject *100 to the liabilities of said corporation, which said liabilities are hereby assumed by the partnership. The Parties of the First to the Ninth Parts, inclusive, are stockholders of Yellow Cab Company of Seattle, owning and holding all of the outstanding stock of said corporation, and said parties do hereby sell, assign, transfer and set over unto the partnership hereby formed all of such assets distributed to them upon final liquidation of said corporation, subject to all the liabilities of said corporation. The Parties of the Sixth, Seventh, Eighth and Ninth Parts have sold to the Party of the Tenth Part one-fifth (1/5) of their interest in such assets distributed to them upon final liquidation of said Yellow Cab Company of Seattle. "DECISIONS AS TO PARTNERSHIP MATTERS. SIXTH: Except as otherwise herein provided, decisions as to partnership matters shall be made by a majority in interest of the partners. "SALARIES AND DISTRIBUTIONS OF PROFITS. SEVENTH: Partnership profits shall be paid and applied as follows and in the following order of priority: "(a) A. H. Wenck, Fifth Party, shall manage the business of the partnership and shall receive a monthly salary in such amount as may *101 be determined from time to time by decision of the partners. "(b) B. Royce, First Party, E. Royce, Second Party, W. L. Rothschild, Sixth Party, and J. A. Baldi, Seventh Party, will devote as much of their time to the business of the partnership as they deem necessary. Each such party shall be sole judge of the amount of his own time necessary for such purpose. W. L. Rothschild and J. A. Baldi will serve without compensation. B. Royce and E. Royce will each receive two and one-half per cent (2 1/2%) of the net profits of the partnership business, but not exceeding Five Thousand Dollars ($5000) each per annum. "(c) The balance of the profits, if any, shall be divided among the partners as follows: "NAME
PERCENTAGE
B. Royce
1402 1/2
5500ths
E. Royce
300
5500ths
E. Royce, Trustee
for E.M.
700
Royce, a minor
5500ths
D. F. Royce
402 1/2
5500ths
A. H. Wenck
269 1/2
5500ths
W. L. Rothschild
485 1/2
5500ths
J. A. Baldi
485
5500ths
G. E. Worster
485
5500ths
D. N. Newton
485
5500ths
L. S. Ackerman
485
5500ths and any loss sustained on account of said business shall be borne in the proportions last hereinabove mentioned * * *102 * "DRAWING ACCOUNTS AND DISTRIBUTIONS OF PROFITS. EIGHTH: No withdrawals of capital or payment of profits shall be made by or to any partner unless such withdrawals or payments are uniform as to all partners in proportion to their respective interests and are authorized by decision of the partners. "DUTIES OF PARTNERS. NINTH: A. H. Wenck, Fifth Party, shall devote all of his time to the business of the partnership and during its continuance shall not engage in any other business (except Gray Line Tours) unless authorized by decision of the partners * * *
"IN WITNESS WHEREOF, the undersigned have caused these presents to be executed as of the day and year first hereinabove written. "/s/ B. Royce /s/ E. Royce, /s/ E. M. Royce By E. Royce, Trustee /s/ D. F. Royce, /s/ A. H. Wenck, /s/ W. L. Rothschild, /s/ J. A. Baldi, /s/ Geo. E. Worster, /s/ D. N. Newton, /s/ L. S. Ackerman." The Portland partnership and the Seattle partnership kept their books and prepared their tax returns on an accrual basis of accounting during all the years in question. E. Royce was the most active partner in the Portland partnership. He made the important decisions as well as the day-to-day *103 decisions involved in the operation of the business. He was in charge of the office, and his supervision and management included the shop and garage personnel. B. Royce was relatively inactive. Niederkrome was accountant for the Portland partnership. Dora devoted some time to checking the drivers and cars at the stands, boats, depots and any place in Portland where the cabs came frequently to pick up or discharge passengers. She also checked the appearance and condition of uniforms, cleanliness, number of passengers carried and made written reports on these matters to the office. On Schedule I of the partnership returns filed by the Portland partnership for the years 1946 through 1949, no percentage of time devoted to the business by Dora is indicated. Duties similar to those rendered by Dora for the Portland partnership were rendered by an employee of the Seattle partnership for that firm. The drawing accounts of Dora and E. Royce on the books of the Portland partnership show withdrawals during the taxable years 1944 through 1947, as follows: Year
Dora F. Royce
E. Royce
1944
$ 48,777.75
$ 58,184.94
1945
69,180.00
80,820.00
1946
48,865.01
57,086.99
1947
4,612.00
5,388.00
Total
$171,434.76
$201,479.93
*104 The withdrawals of both from the Seattle partnership during the years 1945 through 1949, were as follows: Year
Dora F. Royce
E. Royce
1945
$41,622.53
$30,994.97
1946
19,662.53
14,644.97
1947
12,342.53
9,194.97
1948
12,342.53
9,194.97
1949
5,022.53
3,744.97
Total
$90,992.65
$67,774.85 At the end of 1947, the Portland partnership's accumulated earnings distributable to Dora exceeded her withdrawals by $35,434.76, and those distributable to E. Royce exceeded his withdrawals by $38,395.26. At the end of 1949, the Seattle partnership's accumulated earnings distributable to Dora and E. Royce exceeded their withdrawals by the amounts of $18,733.16 and $14,008.75, respectively. The foregoing withdrawals by Dora were in the form of checks made payable to her. Checks so issued to her by the Portland partnership in 1944, in the aggregate amount of $48,777.75, were endorsed in blank. Another check so issued to her by the Portland partnership on February 23, 1945, in the amount of $11,530, was also endorsed in blank by Dora and paid by the drawee, The U.S. National Bank, on April 3, 1945. All other checks issued to Dora by the Portland partnership and all *105 those issued to her by the Seattle partnership, totaling $170,479.59, were endorsed in blank both by her and by E. Royce. During the year 1944 and through July of 1945, Dora maintained a checking account at the Sixth and Morrison Branch of The First National Bank of Portland in the name of "Mrs. E. Royce." Beginning with August 1945, the account was in the name of "Dora F. Royce." The deposits to and withdrawals from this account for the years 1944 through 1947 were as follows: Year
Deposits
Withdrawals
1944
$ 21,386.75
$ 22,507.83
1945
38,712.25
36,114.11
1946
73,491.78
71,563.02
1947
46,485.00
50,106.19
Total
$180,075.78
$180,291.15 The foregoing deposits represented some of the distribution checks above mentioned. Dora also had occasion to use a safe deposit box during each of the taxable years, into which were placed various amounts of cash derived from such distributions. The balance in the account on January 1, 1944, was $2,242.57 and on December 31, 1947, $2,648.91. A substantial portion of the partnership earnings distributed to Dora by both partnerships was expended in payment of state and Federal taxes. The amounts so expended by Dora *106 for Federal taxes for the years 1944 to 1947 were as follows: Year
Amount
1944
$ 29,793.72
1945
57,315.46
1946
51,721.22
1947
29,454.14
Total
$168,284.54 Dora filed joint returns with E. Royce for 1948 and 1949, and taxes were paid in the amounts of $28,230.87 and $17,522.44, respectively, or a total of $45,753.31. A portion of the distributions made to Dora by both partnerships was expended by her for such items as: Item
Approximate Cost
2 Fur Coats
$ 1,850
2 Chrysler Autos
8,000
Plymouth and Cadillac
Unknown
Exercycle
350
Silverware
1,800
Lace Cloth
400
Government Bonds
7,000
Missouri-Pacific Stock
2,500
House Improvements
18,000
In addition to the above amounts, a total of approximately $70,000 was loaned to E. Royce to be invested in Alder Gold-Copper Company, a company in which, in 1947 and years subsequent thereto, E. Royce was interested. Other amounts were given to E. Royce to reimburse him for payments he had made for Dora. Respondent determined that Dora F. Royce was not a bona fide partner in the Portland and Seattle partnerships, and accordingly included in the income of the petitioner E. Royce the partnership *107 profits reported by her. We conclude that Dora F. Royce was not a bona fide member of the Portland and Seattle partnerships during the taxable years for income tax purposes. Opinion The question is whether, in the years involved, Dora was, for tax purposes, a member of the Portland and Seattle partnerships. As was said by the Supreme Court in Commissioner v. Culbertson, 337 U.S. 733, with regard to the bona fides of a family partnership: "The question is not whether the services or capital contributed by a partner are of sufficient importance to meet some objective standard * * * but whether, considering all the facts - the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent - the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise. * * *" In the earlier case of Commissioner v. Tower, 327 U.S. 280, *108 the same Court had said that where, as here, the validity of an alleged partnership is challenged by an outsider, there arises the question of whether the parties involved "really and truly intended to join together for the purpose of carrying on business and sharing in the profits or losses or both. And their intention in this respect is a question of fact, to be determined from testimony disclosed by their 'agreement, considered as a whole, and by their conduct in execution of its provisions.'" Commissioner v. Tower, supra, at page 287. It is true that the parties went through the formalities of making Dora a partner in both firms. Adequate written agreements were drawn up and signed by all the purported partners. The capital given her by her husband (with the understanding and implied condition that it be invested in the partnerships) was turned in. Dora performed certain relatively inconsequential services for the Portland firm, similar services for the Seattle partnership being performed by an employee. Distributions of profits were made to her in large amounts. However, the checks covering the distributions were endorsed in blank either by Dora or by Dora and *109 her husband and were used to pay income taxes or were largely invested by the husband in various projects in which he was interested. Although E. Royce filed a gift tax return covering the purported gift to Dora of stock in the Seattle corporation (also covering the gift to the trust subsequently herein discussed), there is no evidence that such a return was filed covering the purported gift of the Portland corporation stock. Inconsistent with her testimony that she performed important services are the statements or the pregnant omissions in certain of the partnership returns signed and sworn to by E. Royce indicating that Dora performed no services for the partnerships. We have carefully studied these facts and all the facts pertinent to the issue against the background in which they appear and in the light of the criteria set out by the Supreme Court, and have come to the conclusion that the parties involved at no time really and truly intended Dora to be a bona fide partner in carrying on the business of the Portland and Seattle partnerships. We have accordingly so found as a fact and here so hold. Issue 5 Findings of Fact The declaration of Trust executed by E. Royce on *110 April 20, 1944, and above referred to, provided, in part, as follows: "That I, EZRA ROYCE, of Portland, Multnomah County, Oregon, do hereby declare that I am the sole and absolute owner of the following described personal property in my own right, but do declare that I hold the same henceforth from date hereof, in trust and upon the trusts herein declared and created, for the benefit of my beloved daughter, EUNICE M. ROYCE; and others hereinafter named: "Seven Hundred (700) shares of the common capital stock of The Yellow Cab Company of Seattle, represented by Certificate No. 23. "THE PURPOSE AND THE TERMS AND CONDITIONS upon which I hereby declare that I, as trustee, hold the above-described property in trust are as follows: "(1) To collect the net income therefrom and to pay the same over to my said daughter, or to accumulate the same for her use and benefit, and invest and reinvest the same as hereinafter provided for principal of the trust estate, and as her absolute and separate property for and during the term of her natural life, or until this trust is sooner terminated by my death or otherwise, as hereinafter provided for. "(2) I, as such trustee hereunder, am to *111 have and there is hereby reserved to and vested in me full discretionary power and authority to sell or exchange from time to time, all of the aforesaid property or any part thereof, or any other property belonging to this trust, and to buy any other property upon such terms, for such price, or for such property as in my discretion I shall see fit; and the proceeds so received upon such sale or exchange shall be invested or reinvested in such securities or other properties as I may deem advisable, all of same to be held upon the same trusts as are hereinabove and hereinafter declared. "(3) In the event that it shall appear to me at any time or times that the personal or family necessities of my said daughter require a payment or payments of money to her, then in my sole discretion, I may pay over to her, and there is hereby reserved to me the power and authority to pay over to her, such portion of the corpus of the said trust estate as I may deem necessary or proper; without first applying any net income or accumulated net income therefor, and in such event, any such payments may be treated by me, at my election, as trustee, as if an absolute gift had been made herein of such corpus *112 or portions thereof to my said daughter, or as a loan to be repaid to the trust estate by her, either from future income or otherwise. "(4) This Trust shall be irrevocable, with no power reserved to alter, amend, cancel, revoke or terminate the same, except as may otherwise herein be provided. * * *
"(6) I, alone, hereby reserve the right and power, during my lifetime to nominate and appoint a successor trustee, to carry out the provisions of this trust, in my place and stead, such apointment to take effect either during my lifetime or at my death, as I may direct, by the execution of a formal document designating such successor trustee, but the exercise of such power shall not exhaust the power or extend the term of the Trust. Any such appointment shall be completed upon the turning over and delivery to such successor trustee of the Trust property and estate. "(7) Should I at any time become incapacitated to administer this trust, or upon my death, in default of the appointment of another trustee by me, my wife, DORA F. ROYCE, my brother, B. ROYCE and A. L. SCHNEIDER shall act as co-trustees in my place and stead, each of said co-trustees to have an equal voice in the management *113 of said estate, and such successor trustees are hereby directed to pay to my said daughter monthly or quarterly during her lifetime, beginning with the date of my death, so much of the net income of the trust estate after paying costs and charges as may be necessary to meet the schooling, living and other needs and desires of my said daughter as she may direct. "In the event the annual income from the trust estate in any year, before or after my death, shall fall below $2,000.00, and it shall appear to the trustee or trustees that the personal or family needs of my said daughter shall require a payment or payments of money in addition to the income from the trust property, the trustee or trustees in his or their discretion may pay over to my said daughter, and it is hereby reserved to such trustee or trustees the power and authority to pay over to her, such portion of the principal of the trust estate as may be necessary to pay to my said daughter sums which shall aggregate, at least, the sum of $2,000.00. This provision is not intended to limit the payments to my said daughter, but to enlarge the powers otherwise granted in this instrument. "(8) Before making any investment, change *114 of investment, or sale of any property or securities in the trust fund, the trustee or trustees who succeed me and their successors shall consult and advise with my said daughter, EUNICE M. ROYCE, and, if the said EUNICE M. ROYCE shall fail to indicate her disapproval of any proposed investment, change of investment, or sale, within fifteen (15) days after notice thereof, the trustees, if they deem the same advisable, may make such investment, change of investment or sale, without such approval. "(9) Upon my said daughter reaching the age of thirty-five (35) years, if, in the judgment of the trustee or trustees then living, my said daughter desires to receive the corpus of the trust estate and she is considered by the said trustee or trustees to be capable of managing the trust estate wisely, then, and upon the concurrence of these two events, the trustee or trustees shall convey the corpus of this trust to my said daughter in her absolute right. If, in the judgment of the trustee or trustees my said daughter is not capable of managing the trust estate wisely when she reaches the age of thirty-five (35) years, then as soon thereafter as she convinces the trustee or trustees of her *115 ability to manage said estate wisely, said trust property shall be conveyed to her absolutely. * * * "IN WITNESS WHEREOF, I have hereunto set my hand and seal this 4/20/44 day of April, 1944. Ezra Royce "/s/ (seal)" E. Royce never regarded the Declaration of Trust as a real trust, nor did he treat it as such during the ensuing years. He did not file fiduciary income tax returns for the trust. He made no accounting to Eunice, nor has he ever reported to her in respect to the status of the trust. He filed income tax returns in the name of Eunice M. Royce for the years 1944 and 1946 to 1949, inclusive. He signed her name "Eunice Mae Royce," or "E. M. Royce, by E. Royce, Trustee," on the returns. He so filed an unsigned Form 1040 for 1945. Eunice became 18 years old in 1947. She lived at home until then. From 1947 to 1951 she went to the University of Oregon. From March 1952 to March 1954, Eunice worked for the Imperial Travel Bureau. She was married June 12, 1954. She is now Eunice Dodge and resides at Wenatchee, Washington. At the time of the hearing she was 26 years of age. Eunice was first told about the trust when she was 18 years of age. During the years in question, *116 substantially the only income reported on the returns filed in the name of Eunice Royce represented those earnings of the partnership distributable to "E. Royce, trustee for E. M. Royce," as follows: Year
Amount
1945
$47,797.11
1946
54,826.23
1947
47,645.90
1948
20,863.27
1949
16,611.08 The drawing account of "E. Royce, trustee for E. M. Royce," on the books of the Seattle partnership disclosed withdrawals aggregating $205,154.94 during the period from January 1, 1944, to December 31, 1949, as follows: Year
Amount
1944
$ 16,422.49
1945
77,422.49
1946
46,922.49
1947
34,192.49
1948
21,462.49
1949
8,732.49
Total
$205,154.94 On December 31, 1949, the earnings distributable to "E. Royce, trustee for E. M. Royce," exceeded the withdrawals by $32,592.59. The excess amount had been retained in the business and not withdrawn. The foregoing withdrawals were deposited by E. Royce in a trust account at The U.S. National Bank. E. Royce, alone, was authorized to sign checks on this account. He has exercised absolute discretionary power and authority over the funds and, excepting for certain small amounts, Eunice has never received anything *117 from the trust. The checks issued by E. Royce on the trust account during the period from January 1, 1944, to December 31, 1949, aggregated $186,046.21, leaving a balance in the account of $19,108.73. These funds were directed to the following purposes: Payment of Federal and state taxes
$ 89,464.96
Purchase of Government bonds
281.25
Payment of personal expenses of
Eunice Royce
2,200.00
Loans to or for E. Royce
94,100.00
Balance left in account
19,108.73
Total
$205,154.94
During the years involved, Eunice had a personal checking account in The First National Bank, to which E. Royce sometimes deposited small amounts drawn from the trust account for certain personal expenses of Eunice while she attended college. Such deposits were as follows: Date
Amount
December 1, 1947
$ 200.00
March 4, 1948
300.00
June 15, 1948
300.00
June 20, 1949
300.00
September 23, 1949
300.00
October 27, 1949
300.00
Check No. 20
200.00
Check No. 35
300.00
Total
$2,200.00
The sole investment of trust funds in Governmental or other conventional securities amounted to $281.25. This investment consisted of three checks drawn on the trust account *118 in 1944 and 1945, made payable to "Yellow Cab Co.," as follows: Date of Check
Amount
December 9, 1944
$ 75.00
May 17, 1945
75.00
November 29, 1945
131.25
Total
$281.25
The "loans" to E. Royce from the trust account aggregated $94,100 on December 31, 1949. Of this amount, $7,100 was loaned to Royce, Inc., and the balance of $87,000 to E. Royce, personally. Royce, Inc., owned the Columbia Athletic Club building, and E. Royce was principal stockholder of the corporation. The loans to Royce, Inc., were made in 1948 and 1949, and were repaid in 1950. The loans to E. Royce consisted of three checks drawn on the trust account at the time and in the amounts indicated below: Check No.
Date of Check
Amount
6
Between June 15 and July
10, 1945
$60,000.00
10
December 29, 1945
25,000.00
15
July 10, 1946
2,000.00
Total
$87,000.00 These loans have not been repaid, and are now evidenced by three renewal notes bearing 3 per cent interest, the original notes having been canceled. These renewal notes are 1-year notes made payable to Eunice Mae Royce. The dates of execution, face amounts and other data shown thereon are as follows: Amount
Repayment -
Date of Execution
of Note
Amount & Date
July 10, 1951
$ 2,000
$ 200 (6-18-53)
500 (5- 5-53)
230 (5- 7-54)
85 (9-26-53)
July 7, 1952
60,000
3,500 (1-13-54)
1,000 (2-15-54)
December 26, 1953
25,000
None
$87,000
$5,515
*119 No interest has been paid and, aside from the above payments, the loans to E. Royce from the trust account remain unpaid to date. Respondent determined that Eunice Royce was not a bona fide partner in the partnership and accordingly included in the income of the petitioner E. Royce the partnership profits in the returns filed in her name. E. Royce and the other parties involved did not in good faith and acting with a business purpose intend to join together with Eunice or with the trust of which she was beneficiary as partners in the conduct of the Seattle partnership. Opinion This issue involves Docket Nos. 51526 and 51527 and presents the question of whether Eunice or the trust of which she was beneficiary was a member, for tax purposes, of the Seattle partnership during the taxable years. Here, again, the same criteria are to be employed in determining the true intent of the parties concerned, as in the preceding issue. Commissioner v. Culbertson, supra.Having thus considered all of the facts and circumstances found on this record which bear upon the intent of the parties, we have found as a fact that they did not in good faith and acting with a business *120 purpose intend to join together with Eunice or the trust of which she was beneficiary as partners in the present conduct of the Seattle partnership. Such finding resolves the issue here before us. A detailed recital of the facts upon which our conclusion is based would serve no useful purpose. Suffice it to say, such facts do not materially differ from those found in such cases as Herman Feldman, 14 T.C. 17, affd. 186 Fed. (2d) 87; Lyman A. Stanton, 14 T.C. 217, affd. 189 Fed. (2d) 297; Stanback v. Robertson, 183 Fed. (2d) 889; Zander v. Commissioner, 173 Fed. (2d) 624, affirming a Memorandum Opinion of this Court [6 TCM 1205,]; and Economas v. Commissioner, 167 Fed. (2d) 165, affirming a Memorandum Opinion of this Court [6 TCM 904], wherein it was held that a trust under the circumstances there present was not a bona fide partner in the business enterprises respectively involved and that the parties did not so intend. Cf., also, Joseph J. Morrison, 11 T.C. 696, affd. 177 Fed. (2d) 351; T. Edward Ritter, 11 T.C. 234, affd. *121 174 Fed. (2d) 377; Elwin S. Bentley, 14 T.C. 228, affd. 184 Fed. (2d) 668. The factual situation here cannot be satisfactorily distinguished from those in the cited cases and the rationale employed therein is equally apposite here whether we consider the trust created by E. Royce, or Eunice individually, as the entity involved. On the other hand, Thomas H. Brodhead, 18 T.C. 726, affd. 210 Fed. (2d) 652; and Theodore D. Stern, 15 T.C. 521, cited and relied upon by petitioners, are clearly distinguishable on their facts and are of no application here. There was no substantial change made in the economic position of E. Royce or in the management and control of the Seattle partnership. The capital donated by E. Royce to himself as trustee and then, in turn, to the Seattle partnership was part of that which he had previously employed in the business. The conduct of the business remained unchanged. Under the trust instrument, E. Royce retained broad powers as trustee to control, manage and invest the trust corpus as he should see fit. He kept substantially the same control over the property as he had previously *122 exercised. The income of the trust was to be accumulated or distributed to Eunice as he, in his sole discretion, saw fit. The fact is that a very small percentage of the earnings distributed to the trust was ever distributed to Eunice or invested in Governmental or other conventional securities for her. The bulk of such distributions, after they were applied in payment of taxes, was "loaned" to or "invested" by E. Royce in various projects in which he was interested with no more apparent restrain than there would have been had the trust never been declared. Respondent's determination as to this point is sustained. Issue 6 Findings of Fact The Portland partnership reported the sale of 76 used taxicabs in the capital gains section of its income tax return for 1947. The cabs sold were certain model 1941 and 1942 Plymouth sedans which had been used by the partnership during the war period. The cabs were repainted and prepared for sale to the public in the garage of the partnership. Niederkrome, the accountant for the Portland partnership, reported used cab sales in the Monthly Car Record on the basis of information furnished him by E. Royce. E. Royce was actively in charge of *123 used cab sales in 1947. In accounting to the partnership, E. Royce followed the practice of turning over to Niederkrome an amount of currency representing the net proceeds from a sale, together with information identifying the cab by company and motor number. Information concerning the name of the purchaser, the price paid by the purchaser, the amount of commission or any other expense of sale was not furnished to Niederkrome. The amounts shown by Niederkrome on the records and returns of the partnership represented net figures or the balances of proceeds which remained from sales after E. Royce had deducted commission, expenses and other items known only to him. E. Royce sold at least 29 cabs in 1947 through James D. Hamilton, used car dealer, Portland, Oregon. Although E. Royce would always accept checks, both Hamilton and E. Royce preferred to deal in cash, and the payments made by Hamilton were mostly in cash. Frequently it was necessary for Hamilton to cash his own checks, so as to enable him to make payment to E. Royce in currency. E. Royce paid Hamilton a commission of $100 for every cab sold by him. This arrangement was terminated in April 1949. Hamilton kept records consisting *124 primarily of "deal" envelopes on which information concerning each cab was shown, including motor number, make and model of car, certificate of title, purchaser, sales price and the amount paid to E. Royce. The amount paid to E. Royce was shown as a net figure on the records, that is, after commission and other expenses, if any, were deducted from the sales price. The deal envelopes kept by Hamilton were examined by respondent's agents. They disclosed 29 cab sales, and complete information was available concerning 14 cabs. These records were subsequently destroyed or lost. Pertinent data concerning the 14 cabs sold on consignment through Hamilton follows: Amount
Net Payment
Reported
Cab No.
to E. Royce
by Partnership
77
$ 795.00
$ 700.00
16
800.00
695.00
67
800.00
700.00
37
800.00
600.00
56
700.00
625.00
96
850.00
650.00
48
845.00
665.00
95
800.00
690.00
17
895.00
690.00
94
895.00
690.00
22
895.00
650.00
64
895.00
695.00
69
895.00
695.00
50
775.00
700.00
Total
$11,640.00
$9,445.00 E. Royce sold at least 47 cabs in 1947 to purchasers other than Hamilton. Of these sales the examining officers were able to trace *125 14 to the purchasers. E. Royce sold 8 cabs through his salesman, Reed Lovelace, who received a commission for each cab sold. The remaining 6 cabs were sold to purchasers on the floor of the partnership garage. Johnson Auto Company, a partnership engaged in the used car business, Portland, Oregon, purchased 6 cabs. Payment was made with 4 checks payable to Reed Lovelace. Check Nos. 118 and 427 in the amounts of $725 and $1,500, respectively, were endorsed by Lovelace to Yellow Cab Company. Check No. 443, in the amount of $2,550, was endorsed in blank by Lovelace to E. Royce. Check No. 442, in the amount of $75, was in payment of Lovelace's commission and was cashed by him. Leo Overroedder purchased 2 cabs. Payment was made by check in the amount of $1,500 payable to Lovelace and endorsed by him to E. Royce. The remaining 6 sales were made to Ward Motor Company, Ronald McKenzie and William Bieker on the floor of the partnership garage after examination by the purchasers. Ward Motor Company, engaged in the business of selling automobiles in Bend. Oregon, purchased 4 cabs. The purchase was made by W. L. Pierce, sales manager. Payment was made with two checks totaling $3,200 payable *126 to Pierce, endorsed by him to E. Royce. Bieker, a school teacher, Estacada, Oregon, and McKenzie, a police detective, Portland, Oregon, each purchased a cab. Bieker purchased his from the shop foreman. The cab sold to McKenzie was repainted and had new bumpers installed. Bieker paid by check in the amount of $900, payable to Yellow Cab Company. McKenzie paid $900 in currency to Yellow Cab Company. Pertinent data concerning the foregoing 14 cabs are as follows: Amount
Reported
Sales
by
Price per
Partner-
Cab No.
Purchaser
Purchaser
ship
54
Johnson Auto Co.
$ 700.00
$ 625.00
61
Johnson Auto Co.
725.00
650.00
75
Johnson Auto Co.
725.00
650.00
59
Johnson Auto Co.
850.00
665.00
73
Johnson Auto Co.
850.00
665.00
76
Johnson Auto Co.
850.00
690.00
62
Leo Overroedder
750.00
650.00
86
Leo Overroedder
750.00
650.00
18
Ward Motor Co.
800.00
700.00
42
Ward Motor Co.
800.00
700.00
83
Ward Motor Co.
800.00
700.00
85
Ward Motor Co.
800.00
700.00
23
Wm. E. Bieker
900.00
700.00
34
Ronald E. McKenzie
900.00
625.00
Total
$11,200.00
$9,370.00 E. Royce concluded in 1949 that he had also failed *127 to account to the Portland partnership for cab sales in the amount of $14,100. Of that amount, E. Royce received $5,100. The remaining $9,000, relating entirely to sales made in 1948, he has never received from Hamilton. The examining agents were unable to trace the sales, or to allocate them properly according to the year or years in which made, but took them into account in arriving at the estimated understatement for the year 1947 of $15,000. One year later, on April 6, 1950, E. Royce turned over the above-mentioned $5,100 to Niederkrome with instructions to record it on the books of the partnership. Niederkrome debited the amount of $5,100 to the cash journal and credited a like amount to an account No. 5091 entitled "Depreciation Adjustment." E. Royce has never accounted to the partnership for the remaining $9,000 in cab sales, and these sales remain unrecorded on the partnership books and unreported in its tax returns. The sales of used taxicabs by the Portland partnership in 1947 were understated in the net aggregate amount of $4,525. Opinion This issue involves Docket Nos. 51527 and 51528. The question in dispute is whether the Portland partnership understated its reported *128 sales of used taxicabs in the year 1947 and, if so, the amount thereof. Respondent determined that there was such understatement and in the amount of $15,000. Petitioners attack respondent's action as being no more than an arbitrary estimate based upon an equally arbitrary assumption having no real basis in fact. Petitioners would thus have us expunge the deficiency determined by respondent in its entirety, under the rule of Helvering v. Taylor, 293 U.S. 507. In the alternative, while emphatically denying any understatement, petitioners maintain that if there was such, it could in no event have exceeded $2,825. Respondent admits that the actual amount of understatement determined by him was an estimated sum computed on a basis of an average understatement of $200 for each of the 76 cabs sold by the Portland partnership in 1947. The average thus used and the total understatement determined were arrived at, says respondent, after the sales of 28 cabs, the only ones concerning which any records could be found, were analyzed and evidence bearing upon the $14,100 in cab sales admittedly unaccounted for by E. Royce was "taken into account." The facts found on this record *129 show clearly that the difference in the amount received for the 28 cabs, the sales of which were analyzed by respondent, and the amounts recorded and reported by the Portland partnership averaged substantially less than the $200 used by respondent in arriving at his determination. In this connection, petitioners have adduced evidence showing that approximately $100 per cab sold was paid out by way of commissions to those effecting the sales; that on many occasions other amounts were spent for repainting and repairing the cabs sold; and that it was the standard practice of the Portland partnership to record and report only the net amounts realized from these sales. It seems clear, however, that on several sales all such expenses were deducted prior to any payment being made to the Portland partnership and there was a further write-down in the amount reported. With respect to the $14,100 of unaccounted for sales, we have found that $9,000 thereof has never been received by E. Royce or the Portland partnership but still remains unpaid and that, in any event, such amount represents sales consummated entirely in 1948. As to the remaining $5,100, the receipt of which by E. Royce is admitted, *130 there is no evidence specifically showing what part is properly allocable to 1947 sales, but a fair inference to be drawn from all the testimony bearing on the point is that some portion of the $5,100 in question does in fact properly belong to sales effected in that year. Thus, in recapitulation, while we agree with petitioners that respondent's determination is excessive in amount, we do not agree that the determination of understatement of 1947 sales is, in itself, on the record made, without foundation in fact. Viewing all the evidence and considering all inferences therefrom, we have come to the conclusion that the Portland partnership's sales of used taxicabs in 1947 were understated in the aggregate amount of $4,525. Accordingly, we have so found as a fact and here so hold. Decisions will be entered under Rule 50. Footnotes
*. Proceedings of the following petitioners are consolidated herewith: E. Royce and Dora F. Royce, Docket No. 51526., Ezra Royce, Docket No. 51527; B. Royce, Docket No. 51528; Estate of Isabelle H. Royce, Deceased, B. Royce, Executor, Docket No. 51529; Robert T. Jacob and Agnes C. Jacob, Docket No. 51531; and Albert L. Schneider and Bertha Schneider, Docket No. 51533.↩
1. SEC. 115. DISTRIBUTIONS BY CORPORATIONS. * * *
(g) Redemption of Stock. - If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend.↩
2. SEC. 115. DISTRIBUTIONS BY CORPORATIONS. (a) Definition of Dividend. - The term "dividend" when used in this chapter * * * means any distribution made by a corporation to its shareholders, whether in money or in other property, (1) out of its earnings or profits accumulated after February 28, 1913 * * *.↩